## IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### HARRISON DIVISION

**ROBERT and KIMBERLY SWEARINGEN,**
**as Parents and Next Friends of B**                                     **PLAINTIFFS**

**V.**                                 **CASE NO. 3:16-CV-03029**

**OZARK MOUNTAIN SCHOOL DISTRICT**                          **DEFENDANT**

### <u>MEMORANDUM OPINION AND ORDER</u>

On July 25, 2016, the Court issued an Order (Doc. 17) bifurcating certain issues from the rest of the case and ordering briefing on those issues in an expedited manner. Specifically, the Court ordered that Plaintiffs Robert and Kimberly Swearingen submit a complete copy of the hearing transcript and state administrative record for proceedings that they participated in concerning their child, identified here as "B."  The Swearingens argued in the state administrative hearing conducted by the Arkansas Department of Education that Defendant Ozark Mountain School District ("OMSD" or "the District") had denied B a free appropriate public education ("FAPE"), as that term is defined in the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1415, during B's kindergarten year at Bruno-Pyatt Elementary School.  According to the Swearingens, they prevailed at the administrative level and then brought suit in this Court to, among other things, recover the attorneys' fees they spent litigating the administrative action.

Claim One in the Swearingens' Complaint requests an award of attorneys' fees for being the "prevailing party" at the state administrative proceeding, as defined at 20 U.S.C. § 1415(i)(3)(B).  As per the Court's direction in the Order on Bifurcation of Proceedings, the Swearingens filed a Motion for Award of Attorneys' Fees (Doc. 23) and Brief in Support

(Doc. 24) on August 22, 2016.  This Motion essentially requests summary judgment on Claim One of the Complaint.  The sole issue before the Court in deciding the Motion is whether the Swearingens were the prevailing party at the administrative level.  If so, the Motion should be granted, and judgment as a matter of law on Claim One should issue in the Swearingens' favor.  If not, the Motion should be denied and Claim One dismissed with prejudice.

The second issue before the Court is the matter of OMSD's Counterclaim (Doc. 7), which argues that the administrative Hearing Officer wrongly decided the case in the Swearingens' favor, and that OMSD should have prevailed on the merits.  OMSD briefed its Counterclaim in the process of responding to the Swearingens' Motion for Attorneys' Fees.  *See* Docs. 26, 27.  Thereafter, the Swearingens filed a response to OMSD's briefing on the Counterclaim, *see* Doc. 32, and OMSD filed a reply, *see* Doc. 33.  OMSD contends that the Hearing Officer erred in refusing to acknowledge that the Swearingens' claims under the IDEA were barred as a matter of law because B no longer attended school within the District at the time the hearing took place.  OMSD also maintains that it fully complied with the IDEA and did not deny FAPE to B while he was enrolled at Bruno-Pyatt Elementary School during the 2014-2015 school year.

On December 5, 2016, the Court conducted a hearing on these issues, during which both parties had the opportunity to present oral argument, and neither party submitted new evidence for the Court's consideration.  Below, the Court has set forth the legal standard it has considered in evaluating OMSD's appeal of the state administrative Hearing Officer's decision under the IDEA.  In reviewing the appeal, the Court has examined the parties' briefing, the entire administrative record, the Hearing Officer's written Opinion, and the

relevant case law.  For the reasons set forth below, the Court **AFFIRMS** the Hearing Officer's decision in favor of the Swearingens, which, in effect, means that the Counterclaim filed by OMSD is **DISMISSED** as a matter of law, and the Swearingens' Motion for Attorneys' Fees will be **GRANTED**, resulting in judgment in favor of the Swearingens on Claim One of their Complaint.

## I. BACKGROUND

The administrative record in this case is lengthy, and it amounts to several volumes of hearing transcripts and documents.  With that said, however, the pertinent, undisputed facts concerning B's educational history are relatively straightforward.  Prior to entering kindergarten at Bruno-Pyatt Elementary School, B was a preschool student at Ozark Unlimited Resources Cooperative, a Head-Start facility located in OMSD.  In preschool, B was identified as a student who needed special education services.  His parents were presented with an Individualized Education Program ("IEP"), as contemplated by the IDEA. *See* Doc. 25, pp. 5-19.  At the time B was evaluated for special education services, he was four years and ten months old.  The areas in which he was deemed deficient were: cognition, social/emotional, and language. *Id.* at p. 5.

In the area of cognition, B was described as "ha[ving] trouble understanding ordinal positions, matching quantity with numeral past 2, and counting past 3." *Id.* at p. 8.  The report went on to state that B's "deficits in the cognitive domain adversely affect his progress in the general curriculum" and B's "lack of understanding of age appropriate concepts inhibits his ability to participate meaningfully in age appropriate learning activities." *Id.*

3

As for B's social/emotional skills, he ranked in the 4th percentile.  *Id.* at p. 11.  The report explained that "[t]his score indicates that his social skills are poor."  *Id.*  B could not repeat rhymes, songs, or dances, play group games with simple rules, or play competitive games.  *Id.*  Ms. Heather Gilbert, a developmental therapist in early childhood special education, explained in writing that "[a]ny score below the 7th percentile is considered to be a significant delay in function in that area."  *Id.* at p. 32.

Finally, with respect to the area of language ability, B's performance was similarly deficient, as evaluators found he was unable to explain "the function of objections, using plurals and irregular plurals, and telling a story about a picture."  *Id.* at p. 14.  Although B could identify common objects when prompted, the evaluators found that B's "deficits in the language domain in expressive language adversely affect his progress in the general curriculum" and ability "to participate meaningfully in age appropriate learning activities."  *Id.*

In accordance with the IDEA, and with the approval of his parents, B's preschool implemented a comprehensive plan to address his cognitive, social/emotional, and language deficiencies.  *See id.* at pp. 34-35.   However, when it came time for B to transition to kindergarten, his eligibility for special education services was required by law to be reevaluated.  OMSD's elementary special education teacher, Mary Beth Anderson participated in this evaluation and observed B in his preschool class on two occasions, later making a report of her findings.  *See id.* at pp. 47-48.  In her report, Ms. Anderson noted that B was both a frequent distraction to others in class and also was easily distracted.  *Id.* at p. 47.  She observed that B "did not interact with his peers and anytime

that he did interact with his peers it was in a negative way." *Id.* at p. 48. A speech/language therapist then evaluated B on March 18, 2014, at the tail end of his last year of preschool, and found contrary to earlier evaluations that B's language deficits were not so severe that they interfered with his classroom learning. *Id.* at p. 53. She drew this conclusion despite the fact that B apparently scored in the 19th percentile in expressive communication skills. *Id.* The speech/language therapist also observed in her report that B "kept making noises . . . that were not words during his speech," "did not answer questions appropriately" in some instances, and when leaving the testing site "became interested in a toy and had some difficulty separating from it." *Id.* at p. 54.

Based on the above evaluations, OMSD ultimately determined at the conclusion of the transition conference that B did not meet the criteria for having a specific learning disability. The Hearing Officer later observed that "even though the District was aware of [B's] maladaptive behaviors [in preschool], they elected to conduct an evaluation to determine only if the Student met the criteria of having a specific learning disability." (Doc. 9-1, p. 17). In reviewing the record, it appears that, despite the fact that B exhibited numerous behavioral/social/emotional problems in preschool that were being addressed through an IEP, OSMD focused in the transition conference on the fact that B's IQ appeared to be in the normal range, and his speech/language skills had been deemed adequate for his age level. Without a referral for special education services, B began kindergarten without any special education support.

Almost immediately after starting kindergarten, B began displaying the same behavioral issues that he did in preschool, namely: difficulty with transitions, inability to keep his hands and feet to himself, difficulty communicating with others, and difficulty in

toileting without prompting or assistance. B's mother expressed to the school her concern that perhaps B was autistic or had some other behavioral/medical condition that could be the cause of his issues at school. *See* Hearing Transcript, Vol. IV, p. 45. But she testified at the administrative hearing that she was under the impression that the school was not planning on doing anything to address B's problems until she first had B officially "diagnosed," or "evaluated by a doctor," something that she could not do immediately, as seeing a specialist involved making an appointment and waiting for an opening. *See* Hearing Transcript, Vol. IV, p. 45. Meanwhile, B's principal testified that she contacted the District's behavioral specialist for assistance with B in the kindergarten classroom as early as the fall semester of 2014, just after the school year started. The behavioral specialist tried to assist B's kindergarten teacher on an informal basis, making general suggestions for discipline and improvements to the classroom environment, but the specialist testified at the administrative hearing that she was unable to provide specific assistance to B because he was not currently receiving special education services. *See* Hearing Transcript, Vol. III, p. 233, 254. She further testified that she had no authority to refer B for evaluation on her own—someone at his school needed to refer him. *Id.*

B's behavioral issues led to him missing a significant amount of time from school, which the Swearingens argue was one factor among many constituting a denial of FAPE. For example, in the first few weeks of kindergarten, B had such serious issues with toileting that Mrs. Swearingen was called to the school routinely to clean and dress B in fresh clothes, or else take him home for the day. She testified that she informed his teacher that he needed both prompting and help when using the bathroom, but despite this, B continued to have accidents at school and on more than one occasion came home from

6

school covered with feces.  *See* Hearing Transcript, Vol. IV, pp. 63-66.  There were other behavioral issues B exhibited that were persistent, frequent, and distracting, according to the testimony of school officials.  The principal of B's elementary school, Ms. Mitzi Cantrell, testified that B hit other students frequently, put them in headlocks, chased students with a stick, would hide behind trees and refuse to come in from the playground, would not make eye contact with her, and on one occasion defecated in her office while he was waiting for his father to pick him up.  *See* Hearing Transcript, Vol. 1, pp. 34-40.

In the first half of the school year, Ms. Cantrell attempted to address B's mounting behavioral problems by referring B and his parents to Youth Ridge, an agency she describes as providing social and emotional counseling for children and parents.  However, B's parents declined to attend counseling because they did not think the service would be helpful.  *See id.* at pp. 42-45.  Ms. Cantrell testified that, despite B's challenging behavior issues, she never considered referring him for a special education assessment in the first semester of the school year.  *Id.* at p. 47.

As B's behavior deteriorated, he was pulled out of class to receive discipline more and more frequently–either to have one-on-one time with a teacher or teacher's aide, or to run laps on the track or run up and down the stairs while a teacher monitored him.  The record reflects that B was often sent home early for aggressive or disruptive behavior, and on at least one occasion was suspended from school.  Ms. Cantrell and B's teachers responded by attempting to address his problems with "fixes" of their own devising, or by continuing to seek the informal advice of the District's behavioral specialists.  For example, Ms. Cantrell testified that she consulted informally with Ms. Anderson, the school's special education teacher, and would call her to B's room to help B's kindergarten teacher when

7

B failed to comply with directions.  *Id.* at p. 50.  In addition, it appears that the school somehow acquired a number of medical devices that the principal or members of the staff speculated might help with B's maladaptive behaviors, including a "bouncy seat," a "weighted blanket," and "weighted gloves."  *Id.* at p. 52.  The record is not crystal clear about when these devices were acquired, but Ms. Cantrell testified that she never met with B's parents to formally discuss these "assists" before trying them in the classroom.  *Id.* Ms. Cantrell further conceded that "[n]obody was prescribing [any of these devices]."  *Id.*

The Swearingens' attorney asked Ms. Cantrell during the hearing why she never made a special education referral early on in the school year, once it was evident to her that B's emotional and behavioral issues were disruptive and required professional—and perhaps medical—intervention.  Ms. Cantrell explained that the reason why she did not refer B for services was "[b]ecause he did not qualify at the beginning of the year."  *Id.* at p. 110.  Further, she testified that she was worried that B's parents would not want him to be referred to special education—despite the fact that B participated in special education in preschool and followed an IEP there.  When pressed on these points during the hearing, Ms. Cantrell explained:

| | |
|---|---|
| Ms. Cantrell: | I didn't think [B's mother] wanted me to refer him.  Never in any conversation did she want me to refer him. |
| Attorney: | Did you talk to her about a referral? |
| Ms. Cantrell: | Well, he was tested prior to the kindergarten year. |
| Attorney: | Right.  Was he tested for his social, emotional piece?  Do you know whether they did that? |
| Ms. Cantrell: | I don't — I don't know what all was tested.  I just know that he didn't qualify. |

. . .

8

Attorney:          Okay.   But you were having trouble, you were
                   struggling, you were pulling everybody in to help you,
                   right? With [B's] behavior?

Ms. Cantrell:      Behavior, yes.

*Id.* at 113, 115.

Further, as is detailed in the Hearing Officer's written Opinion, the school recorded

multiple "disciplinary violations" involving B throughout the first semester of the school year,

in September, October, November, and December of 2014.  (Doc. 9-1, pp. 10-11).  These

incidents continued into the following semester, and B's parents were contacted by the

school multiple times in January, March, and April of 2015 regarding B's maladaptive

behaviors.

In January of 2015, B's parents were able to schedule an appointment to have B

examined by a physician, for the purpose of obtaining a medical diagnosis regarding B's

problems at school and at home, and in an attempt to qualify for special education

services—as the Swearingens believed they needed to obtain a medical diagnosis before

B would be referred by the school for special education.  The physician, Dr. Eldon Schultz

at the Dennis Development Center's clinic in Marshall, Arkansas, performed an evaluation

and diagnosed B with "ADHD-Hyperactive Impulsive Type with functional impairments in

the social and behavioral domains," (Doc. 25, p. 110), as well as "hypotonia," *id.* at p. 109,

which is a condition in which the subject displays low muscle tone or strength in the

extremities.   *See* National Institute of Neurological Disorders and Stroke,

http://www.ninds.nih.gov/disorders/hypotonia/hypotonia.htm (last visited Dec. 2, 2016).

Dr. Schultz also observed that B likely had a sensory processing disorder.  (Doc. 25,

p. 109).  He observed in his written report that "there have been no modifications or

9

accommodations made in his classroom," and suggested that the Swearingens visit a website "to develop home and classroom strategies to minimize the impact of [B's] core ADHD on his performance" and "meet with the school to consider classroom and curricular modifications including a possible 504 plan." *Id.* at p. 110.

As the Hearing Officer noted in his Opinion, Dr. Schultz's diagnosis did not provoke the school to refer B for evaluation for special education. (Doc. 9-1, p. 12). Instead, the school on January 29, 2015 scheduled a meeting with the counselor, B's kindergarten teacher, the school principal, Ms. Cantrell, and B's parents to develop a plan for services pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), a civil rights law that, among other things, prohibits discrimination against individuals with disabilities by programs that receive federal funding. *See* Doc. 25, p. 123. On February 12, 2014, a finalized 504 Student Accommodation Plan ("Plan") was developed for B. (Doc. 25, pp. 130-132). The Plan only noted B's ADHD diagnosis and did not address Dr. Schultz's diagnosis of hypotonia or his suggestion that B likely had a sensory processing disorder and needed further testing by the school for this condition. The Plan's only accommodations were as follows: "preferential seating ([B's] own space), extended time for work and testing, physical active involvement whenever appropriate, plenty of notice for transitions, positive re-enforcement (point system), behavior redirection, time out/restriction of privilege for discipline, short & specific directions, consistent routines." *Id.* at p. 132.

It appears that after the 504 Plan was put in place, OMSD staff simply collected data for the next several months, detailing B's continuing behavioral problems in the face of all the accommodations implemented through the Plan. *See id.* at pp. 133-151. As the documents reflect, B's maladaptive behaviors persisted through at least April of 2015,

10

without abatement.  Then on April 14, 2015, Dr. Schultz's office sent a letter to OMSD to "ask[] the school (in [B's] behalf) for a 504 Plan to address his issues in regard to his diagnosis of ADHD" and that the Plan "exclude paddling & suspensions for his behavior"—both of which had been administered to B in the past.  *Id.* at p. 154.  Further, Dr. Schultz recommended that a behavioral specialist from the District "come & observe & make recommendations for all involved in [B's] schooling."  *Id.*  This recommendation was made despite the fact that District policy dictated that a specialist could not be involved unless the student was being considered for or was already receiving special education services.  *See* Hearing Testimony of Dr. Stacy Moore, Behavior Support Specialist for O.U.R. Educational Cooperative, Vol. III, p. 254 (explaining that it is the District's role to refer a child for special education testing and services prior to involving a behavioral specialist in the case).

On April 16, 2015, unbeknownst to B's parents, Ms. Cantrell submitted a referral for B to be evaluated and considered as a student in need of special education services, due to the District's recent assessment that B's behaviors had not improved with the implementation of the 504 Plan, but had only escalated.  Just the day before the referral was made, on April 15, 2015, B's parents took him to see a speech-language pathologist, who in turn referred B to a licensed psychologist for evaluation for Autism Spectrum Disorder.  Before the appointment with the psychologist took place, B's parents on April 20, 2015, filed an administrative complaint with the Department of Education and withdrew their consent for B to undergo further testing by the school.  OMSD proceeded with its plan to evaluate B for special education services—even though the Swearingens had at that point withdrawn their consent for the District to perform testing on B.  An IEP committee

met— without B's parents present—on May 4, 2015, and determined that B should remain on the 504 Plan for the time being. Then, on May 7, 2015, the Swearingens withdrew B from school following an incident they claim resulted in a teacher grabbing B so roughly that B's arms were bruised.

On May 18, 2015, B was evaluated by a psychologist and diagnosed with a mild form of Autism Spectrum Disorder. *See* Doc. 25, pp. 213-217. The school never learned about this diagnosis because B had already withdrawn from school at that point, never to return.

On July 19, 2015, the day before the scheduled due process hearing on the April 20, 2015 complaint, counsel for the Swearingens became aware that she wished to assert a "Child Find" violation pursuant to the IDEA,[1] and needed to do so by filing a new complaint. She requested a continuance of the hearing date, but that request was denied. The following day, July 20, 2015, the Swearingens filed a new due process complaint, which OMSD concedes was "substantially identical" to the former complaint, except that it added the Child Find claim. *See* Doc. 27, p. 2. Then, on July 21, 2015, the Hearing Officer dismissed the April complaint and proceeded on the July complaint, setting a new hearing date. Shortly thereafter, or perhaps at around the same time, the Swearingens moved out of the District. OMSD's attorney stated during the Court's motion hearing on December 5, 2016, that OMSD believed B to be enrolled in the District until it received notice that he was not, sometime around July 27, 2015. OMSD then filed a motion to

---

[1] The Child Find provisions require that each public school district take affirmative steps to identify, locate, and evaluate children who are in need of special education and related services in order "to determine which children with disabilities are currently receiving needed special education and related services." 20 U.S.C. § 1412(a)(3)(A).

dismiss the complaint due to B's enrollment in a school outside the District. The Hearing Officer denied the motion, and the due process hearing took place over the course of four days: August 20, September 30, October 2, and November 2, 2015.

At the hearing, OMSD denied liability under the IDEA or other applicable law and asserted that the complaint should be dismissed. Both the Swearingens and OMSD presented several witnesses at the hearing, as well as a number of exhibits. The Hearing Officer issued a written Opinion (Doc. 9-1) on December 11, 2015, and the Swearingens, believing themselves to have prevailed at the administrative level, filed the instant Complaint in this Court on March 10, 2016, seeking attorneys' fees under the IDEA and damages under 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act, and Arkansas law. Only the Swearingens' claim for fees and OMSD's Counterclaim that appeals the Hearing Officer's adverse decision are now ripe for resolution.

## II.  LEGAL STANDARD

The IDEA at 20 U.S.C. § 1415(i)(2)(C) states that a district court reviewing an appeal of a hearing officer's decision

(i) shall receive the records of the administrative proceedings;

(ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

Further, under § 1415(i)(3)(B)(i), the district court may, in its discretion, "award reasonable attorneys' fees as part of the costs to a prevailing party who is the parent of a child with a disability."

"The district court must independently determine whether the child has received a FAPE, giving 'due weight' to the administrative proceedings." *Sch. Bd. of Indep. Sch. Dist. No. 11 v. Renollett*, 440 F.3d 1007, 1010 (8th Cir. 2006) (quoting *CJN v. Minneapolis Pub. Sch.*, 323 F.3d 630, 636 (8th Cir. 2003)). The reason why the district court must give due weight to the findings of the hearing officer is because the officer "'had an opportunity to observe the demeanor of the witnesses and because the court should not substitute its own educational policy for those of the school authorities that they review.'" *CJN*, 323 F.3d at 636 (quoting *Strawn v. Mo. State Bd. of Educ.*, 210 F.3d 954, 958 (8th Cir. 2000)).

A prevailing party at the administrative level is entitled to an award of its attorneys' fees.  The Eighth Circuit has explained that a party has prevailed "if it succeeded on any significant issue which achieved some of the benefit it sought." *Yankton School District v. Schramm*, 93 F.3d 1369, 1377 (8th Cir. 1996).  "The IDEA's attorney's fees provision, 20 U.S.C. § 1415(e)(4)(B) (1986), is similar to the civil rights attorney's fees award statute, 42 U.S.C. § 1988 (1986). Under both statutes, attorney's fees should ordinarily be awarded to the prevailing party unless 'special circumstances' exist to make an award unjust." *Borengasser v. Ark. State Bd. of Educ.*, 996 F.2d 196, 199 (8th Cir. 1993).

### III.  DISCUSSION

OMSD advances three arguments in favor of summary judgment on its Counterclaim—and in opposition to the Swearingens' Motion for Attorneys' Fees.  The first argument is that the Swearingens' claims should have been dismissed by the Hearing Officer once it was determined that the family had moved out of the District.  OMSD cites a handful of cases it believes support its argument that due process claims against a

school district are barred if a student is enrolled in a new school district prior to the date of the due process hearing.

The Court has reviewed the cases cited to by OSMD with respect to its argument and finds that these cases concern students and/or parents who *failed to initiate due process proceedings* prior to moving out of their respective school districts. For example, in *Thompson v. Board of Special School District No. 1*, 144 F.3d 575, 578 (8th Cir. 1998), the Eighth Circuit found that a disabled student had failed to state a cause of action under the IDEA "because his request for a review comes after he left the District previously responsible for his education." The Court explained that "[i]f a student changes school districts and does not request a due process hearing, his or her right to challenge prior educational services is not preserved." *Id.* at 579. In other words, the Court held that claims for relief will be barred if the student failed to request a due process hearing *prior to* changing school districts. The *Thompson* Court supported its reasoning on this point by reference to the Supreme Court's decision in *Florence County School District Four v. Carter*, 114 S. Ct. 361 (1993), in which remedial relief—in the form of post-hoc reimbursement of private school tuition—was not barred for a student who left the school district *after* a due process complaint was filed, but *while* those administrative proceedings were still pending, given the fact that the hearing officer concluded that the school district did, in fact, deny FAPE to the student. *Thompson*, 144 F.3d at 579. In the *Thompson* case, the claims were barred because the parent "did not preserve her rights by *instituting* a due process hearing prior to Thompson's transfer [to another school district]." *See id.* (emphasis added).

15

After *Thompson* was decided, the Eighth Circuit considered a similar factual situation in *C.N. v. Willmar Public Schools, Independent School District No. 347*, 591 F.3d 624, 631 n.6 (8th Cir. 2010), and reiterated its holding in *Thompson* "that a student [must] request a due process hearing before transferring from the delinquent district if the student wishes to preserve his or her right to challenge the educational services provided by that district."  The Court explained:

> After all, "'[t]he purpose of requesting a due process hearing is to challenge an aspect of a child's education and to put the school district on notice of a perceived problem. Once the school district receives notice, it has the opportunity to address the alleged problem.'" [citations omitted] . . . . C.N., however, did not request a due process hearing while the District was responsible for her education.  Rather, by the time C.N. requested a hearing against the District, Atwater [Public School District] had already assumed responsibility for providing C.N. with an appropriate education geared toward addressing her specific needs (including any arising from deficiencies in C.N.'s prior education). Under these circumstances, we agree with the district court that C.N.'s IDEA claim fails . . . .

*Id.* at 631.

Comparing the facts above to those in the instant case, it is clear that the Swearingens cannot have been barred from seeking relief from OMSD.  The Swearingens requested a due process hearing on April 20, 2015, while B still attended Bruno-Pyatt Elementary School.  OMSD was therefore on notice of the Swearingens' claims as of the date that complaint was filed, and the District continued to be on notice of these claims through July 20, 2015, the date that the second complaint—which only added a Child Find claim—was filed.  It was not until August 10, 2015, that OMSD received confirmation that B was enrolled in another district.  It follows that the transfer to another district occurred *after* the Swearingens instituted their IDEA case and requested a due process hearing. Furthermore, OMSD has not cited to, nor has the Court independently located, any Eighth

16

Circuit case in which a due-process complainant's claims were barred when the complainant filed for relief against a school district at the same time that the complainant was receiving educational services from that district.

Moving on to OSMD's second argument, the District contends that the Swearingens' claims should be barred because the Hearing Officer stated at the end of his written Opinion that the relief granted would be considered "null and void" and the Swearingens' complaints "dismissed with prejudice" if the parents did "not agree with returning the Student to being the educational responsibility of the District." (Doc. 9-1, pp. 23-24). OMSD argues that the "null and void" language in the Opinion should be interpreted to mean that the Swearingens did not succeed on any of their claims. The Court finds this argument unpersuasive, as it has made a *de novo* review of the record and believes the Hearing Officer's ultimate conclusions to be correct, and, regardless of the "null and void" language the Hearing Officer inserted, would make the same findings and conclusions and would grant the same relief to the Swearingens. The holding in *Thompson* makes clear that a student who has been denied FAPE is entitled to relief even if the student moves out of the district during the pendency of the due process hearing; in other words, moving out of the district does not nullify the right to relief. A more reasonable interpretation of the Hearing Officer's "null and void" language is that he was merely intending to clarify to the parties that if B refused to return to the District, OMSD would not be obligated to develop a temporary IEP, assemble an IEP team, or provide compensatory educational services to B. It further bears mentioning that the Hearing Officer holds a Ph.D. in Psychology and is not a lawyer, and so his use of legal jargon should be taken with a grain of salt.

OMSD's third argument in favor of reversing the Hearing Officer's decision is that OMSD should have prevailed on the merits at the administrative hearing, as in OMSD's view, it fully complied with federal law. OMSD points out that even though B was ineligible for special education services at the beginning of kindergarten, his teacher and school staff still implemented classroom supports at the beginning of the kindergarten school year that were designed to get B's behavior under control, at a time when such behavior became an issue. Further, OMSD observes that it took these informal steps to help B when there was no medical diagnosis of a disabling condition in the school record. Lastly, OMSD notes that it promptly implemented a 504 Plan after receiving an ADHD diagnosis from B's physician, and Ms. Cantrell referred B for special education evaluation towards the end of the school year, in April of 2015, once it became clear that the 504 Plan was not working. According to OMSD, it could have provided further services to B at that point, but his parents interfered with the process by filing their due process complaint and removing B from school.

Having considered OMSD's arguments in light of the full administrative record, and having given due weight to the Hearing Officer's assessments regarding the demeanor of the witnesses, the Court affirms the Hearing Officer's decision. In the Court's view, the Swearingens established that FAPE was denied to B due to OMSD's failure to refer him for a thorough evaluation of all of his disabilities when such were obvious and interfered with his education. Rather than comply with the Child Find provisions of IDEA, which require a district to make a referral for any child suspected of having a disability, the school, and in particular its principal, failed to make such a referral and instead attempted to address these issues informally, seeking help and advice from the special education

18

teacher and the behavioral specialist for the District on a purely informal, "advisory" basis, and without the behavioral specialist having the benefit of observing B in person. School staff also ordered and tested medical devices on B without his parents' knowledge, disciplined him in various ways, including through physical restraints and the use of corporal punishment, and never succeeded in altering B's classroom behavior. When B's parents submitted a doctor's diagnosis of ADHD, hypotonia, and suspected sensory processing disorder, the school responded only to the ADHD diagnosis and failed to test B for anything else.

The school also failed to listen and respond to B's parents, who were frustrated with B constantly missing school and being disciplined in ways that did not lead to constructive solutions. *Cf. Indep. Sch. Dist. No. 413, Marshall v. H.M.J.*, 123 F. Supp. 3d 1100, 1111 (D. Minn. 2015) (observing that excessive absenteeism affects the ability of a child to receive FAPE). The principal admitted when testifying at the administrative hearing that she essentially avoided contact with B's parents out of concern that they were upset with her.

Finally, when the school implemented the 504 Plan, and those solutions proved unworkable and unhelpful, the school's staff did nothing more than document the Plan's failures and declined to take constructive action to help B until the school year was almost at an end, and after B's parents filed for due process relief. Under these facts, the school had an affirmative obligation to refer B for special education testing, and they failed to do so, thus denying B FAPE.

The Court further finds that the Swearingens prevailed at the administrative level, and they are entitled to reasonable attorneys' fees under the IDEA. The Swearingens

made the following claims for relief: (1) that B be declared eligible to receive special education services; (2) that he be evaluated by school specialists for his various behavioral and learning issues; (3) that an IEP team be convened to develop an appropriate IEP to address B's educational needs; and (4) that compensatory special education services be provided to B in the interim, while the IEP was being put in place. The Hearing Officer ordered the following relief: (1) that OMSD develop a temporary IEP for B and comprehensively evaluate B for behavioral, sensory, or autism-related conditions, as well as any learning deficits; (2) that OMSD assemble an appropriate IEP team to consider the results of the aforementioned evaluations and develop a comprehensive IEP for B; and (3) that OMSD provide B with compensatory educational opportunities for eight hours per week until the IEP plan was finally put in place. (Doc. 9-1, p. 23).

Clearly, the Swearingens prevailed here. Further, as previously explained, there is no authority for the proposition that the Swearingens failed to prevail simply because B left the District during the pendency of the due process proceedings and did not enforce the terms of the order. The Swearingens successfully challenged several aspects of their child's education and put the District on notice of a number of problems concerning its compliance with the IDEA, including: (1) OMSD's failure to vigilantly comply with the Child Find provisions, (2) OMSD's failure to consistently and carefully evaluate special education students during the transition period between preschool and grade school, and (3) OMSD's failure to refer students for special education evaluation at the earliest time such evaluation appears necessary. Even though the Swearingens did not elect to continue to send their child to OMSD schools, they brought a successful action on their child's behalf that could, possibly, result in a positive change within the administration of the District and could

20

benefit other special- needs students.  Their complaint was therefore not made in vain, and having prevailed, they are entitled to compensation for their attorneys' fees.

The Court will refrain from making a specific award of fees at this time, as other claims remain for resolution in Plaintiffs' Complaint.  Once all claims in the lawsuit have been resolved, the Court will request briefing from Plaintiffs' counsel as to the amount requested in fees on Claim One. OMSD will then have an opportunity to respond as to the reasonableness of the request and lodge any opposition to the requested amount.  The Court will then consider the briefing and issue an order awarding a reasonable amount of fees to Plaintiffs for prevailing on Claim One of the Complaint.

### IV.  CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that Plaintiffs' Motion for Award of Attorneys' Fees (Doc. 23) is **GRANTED**, and judgment as a matter of law will enter as to Claim One of the Complaint (Doc. 1).

**IT IS FURTHER ORDERED THAT** Defendant's Counterclaim (Doc. 7) is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** on this ___7th___ day of December, 2016.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE